UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

ANTHONY LEE GRAY,              :     CIVIL NO. 3:CV-09-0979
                              :
        Plaintiff             :
                              :     (Judge Nealon)
                              :
    v.                        :
                              :
DAVID J. WAKEFIELD, et al.,    :
                              :
        Defendants            :

**FILED**
**SCRANTON**

OCT 0 2 2013

PER _____
    DEPUTY CLERK

## MEMORANDUM

On May 22, 2009, Plaintiff, Anthony Lee Gray, an inmate currently confined in the

Rockview State Correctional Institution, Bellefonte, Pennsylvania, filed the above captioned

action pursuant to 42 U.S.C. §1981, §1983, §1985, §1986 and for intentional torts allegedly

committed against him in violation of the common law of the Commonwealth of Pennsylvania.

The named Defendants are the following current and former employees of the Pennsylvania

Department of Corrections ("DOC"), and the State Correctional Institution, Huntingdon, ("SCI-

Huntingdon" Pennsylvania, Plaintiff's former place of confinement: David Wakefield, retired

DOC Deputy Secretary; Raymond M. Lawler, retired SCI-Huntingdon Deputy Superintendent;

Michael Harlow, former SCI-Huntingdon Deputy Superintendent for Facilities Management;

Major S.R. Glunt, former SCI-Huntingdon Major of the Guards; Thomas Holtz, former SCI-

Huntingdon Correctional Officer; Jeffrey Ewing, retired SCI-Huntingdon Correctional Officer;

Michael Harmon, SCI-Huntingdon Correctional Officer; Thomas Johnston, SCI-Huntingdon

Security Office Lieutenant; Daniel Baird, SCI-Huntingdon Correctional Officer; Scott

Marabella, SCI-Huntingdon Sergeant; Daryl W. Strittmatter, SCI-Huntingdon Correctional

Officer; David B. Whitsel, SCI-Huntingdon Correctional Officer; Benjamin Butler, SCI-

Huntingdon Correctional Officer; Mark Houp, SCI-Huntingdon Correctional Officer; Robert R. Williamson, SCI-Huntingdon Correctional Officer; David McMahon, SCI-Huntingdon Correctional Officer; Jason D. Shroyer, SCI-Huntingdon Correctional Officer; Timothy L. Prough, SCI-Huntingdon Correctional Officer; John T. Barr, SCI-Huntingdon Correctional Officer; Paula Price, SCI-Huntingdon Registered Nurse; Sheila Fink, SCI-Huntingdon Licensed Practical Nurse; Deanna Strittmatter, SCI-Huntingdon Registered Nurse; Ann Hoffmaster, SCI-Huntingdon Licenced Practical Nurse; and Mary Lou Showalter, SCI-Huntingdon Corrections Health Care Administrator.

Previously by Memorandum and Order dated September 16, 2011, Defendants' motions for summary judgment, alleging Plaintiff's failure to exhaust administrative remedies, were denied. See (Doc. 90). Also, by Memorandum and Order dated September 28, 2012, Defendant Brown's motion for summary judgment was granted and Defendant Brown was terminated from the action. See (Docs. 103, 104).

Presently pending before the Court is the remaining Defendants' motion for summary judgment. (Doc. 120). The motion has been fully brief and is ripe for disposition. For the reasons that follow, the Court will grant, in part, Defendants' motion for summary judgment.

## I.    **Standard of Review**

Federal Rule of Civil Procedure 56(c) requires the court to render summary judgment ". . . forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties

2

will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. Anderson, 477 U.S. at 248; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson, 477 U.S. at 257; Brenner v. Local 514, United Brotherhood of Carpenters and Joiners of America, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. Moore v. Tartler, 986 F.2d 682 (3d Cir. 1993); Clement v. Consolidated Rail Corporation, 963 F.2d 599, 600 (3d Cir. 1992); White v. Westinghouse Electric Company, 862 F.2d 56, 59 (3d Cir. 1988). In order to avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. When the party seeking summary judgment satisfies its burden under Rule 56(c) of identifying evidence which demonstrates the absence of a genuine issue of material fact, the nonmoving party is required by Rule 56(e) to go beyond the pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. Celotex Corporation v. Catrett, 477 U.S. 317, 324 (1986). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industrial Co. v. Zenith Radio, 475 U.S. 574, 586 (1986). When Rule 56(e) shifts the burden of production to the

3

nonmoving party, that party must produce evidence to show the existence of every element

essential to its case which it bears the burden of proving at trial, for "a complete failure of proof

concerning an essential element of the nonmoving party's case necessarily renders all other facts

immaterial." Celotex, 477 U.S. at 323. See Harter v. G.A.F. Corp., 967 F.2d 846, 851 (3d Cir.

1992).

## II.     **Statement of Facts**

From the pleadings, declarations, and exhibits submitted therewith, the following facts

can be ascertained as undisputed.

On June 6, 2007, Plaintiff was housed at SCI-Huntingdon, in building G, Section D,

cell number 1001. Shortly before 9:30 am, on June 6, 2007, Defendants Strittmatter and

Williamson went to Plaintiff's cell to escort him from his cell to a Program Review Committee

("PRC") Hearing in the Restricted Housing Unit ("RHU") Hearing Unit. Before escorting

Plaintiff from his cell, Defendants Strittmatter and Williamson strip searched[1] Plaintiff.

Defendant Strittmatter then inspected Plaintiff's prison jump suit, underwear, socks, and shoes

for contraband. Defendant Strittmatter passed the clothing back to Plaintiff who got dressed.

Defendants Strittmatter and Williamson handcuffed Plaintiff behind his back and attached a

tether to the handcuffs. Once the cell door was opened, Defendants Strittmatter and Williamson

escorted Plaintiff to the hearing room. At all times during this escort, Defendant Strittmatter

---

[1]In accordance with Department policy, a strip search of an inmate is done to determine if the inmate is hiding anything such as a weapon. This search includes looking into an inmate's hears, mouth, under each armpit, between fingers and toes, looking through the inmate's hair and beard, if he has one, shifting the male genitalia, and checking between the inmate's buttocks.

maintained control of the tether attached to Plaintiff's handcuffs. (Doc. 122, Ex. 2, Att. A, Extraordinary Occurrence Report).

On June 6, 2007, the PRC consisted of Defendants Harlow, Corrections Classification Program Manager Brian Corbin, and Unit Manager Scott Walters. Also present in the hearing room were Activities Manager Monroe Kuhns, Defendant Johnston, and Defendant Baird.

At approximately 9:50 am, on June 6, 2007, Defendants Strittmatter and Williamson brought Plaintiff into the hearing room. (Doc. 122, Ex. 2, Declaration of Michael W. Harlow, former SCI-Huntingdon Deputy Superintendent for Facilities Management at ¶ 11). Plaintiff remained handcuffed with his hands behind his back. Id. Defendant Strittmatter maintained his hold on the tether attached to Plaintiff's handcuffs, while C.O. Williamson was beside Plaintiff. Id.

Upon entering the hearing room, Plaintiff lunged toward the table where Defendant Harlow and the other PRC members were sitting. Id. at ¶ 12. See also (Doc. 122, Ex. 1, Declaration of Daryl Strittmatter, SCI-Huntingdon Corrections Officer at ¶ 5); (Doc. 122, Ex. 2-A, Extraordinary Occurrence Report at 2). He spewed out a brown mixture, strongly smelling of feces, directly into Defendant Harlow's face. Id. The brown substance struck Defendant Harlow in the face and chest. Plaintiff then turned towards Unit Manager Walters and Activities Manager Kuhns and spewed the brown substance on them. Id. Mr. Waters was hit in the face and chest, Mr. Kuhns was hit in the chest area. Id.[2]

_____

[2]Although Plaintiff attempts to dispute the sequence of events that occurred on June 6, 2007, (see Doc. 140, Plaintiff's statement of material facts at 1-3), such assertions are refuted by Plaintiff's guilty pleas (see Doc. 122, Ex. 12). See Lawson v. McNamara, 2010 WL 4610820 (E.D. Pa. 2010) aff'd, 438 F. App'x 113 (3d Cir. 2011) (holding that a party may not create a material issue
(continued...)

Defendant Strittmatter pulled on the tether and grabbed for Plaintiff's handcuffs to pull him away from the PRC members. (Doc. 122, Ex. 1, Strittmatter declaration at ¶ 6; Ex. 2, Harlow declaration at ¶ 13; Ex. 2-A, Extraordinary Occurrence Report; and Ex. 3, Declaration of Timothy Johnston, SCI-Huntingdon Security Office Lieutenant at ¶ 3). Plaintiff resisted. Id. Defendant Williamson struck Plaintiff in the neck and shoulder area with his forearm. Id. Together, Defendants Strittmatter and Williamson pulled Plaintiff face down onto the floor of the hearing room and held him there as Plaintiff struggled against their hold. Id.

Sgt. D.E. Hoover and Defendant Houp then joined Defendants Strittmatter and Williamson in gaining control of Plaintiff. (Doc. 122, Ex. 1, Strittmatter declaration at ¶ 7; Ex. 2, Harlow Declaration at ¶ 13; Ex. 2-A, Extraordinary Occurrence Report; and Ex. 3, Johnston declaration at ¶ 2). Sgt. Hoover put a spit shield over Plaintiff's head. Id. Once Plaintiff was under the officer's control, they pulled him to his feet. Id. Together the officers escorted Plaintiff from the hearing room. Id.

Sgt. Hoover and Defendants Strittmatter, Williamson, and Houp kept Plaintiff bent forward from the waist as they escorted him back to his cell. (Doc. 122, Ex. 1, Strittmatter declaration at ¶ 9; Ex. 2-A, Extraordinary Occurrence Report; and Ex. 3, Johnston declaration at ¶ 3). Defendants Williamson and Houp had hold of each of Plaintiff's arms. Id. Defendant Strittmatter held the tether in both hands, shortening it to maintain control as Plaintiff struggled against the officers' holds. Id. The officers took Plaintiff down the steps to the first level,

---

²(...continued)
of fact to defeat summary judgment by relying on a declaration which is inconsistent with his own guilty plea).

through a portion of the RHU until they reached Plaintiff's cell. Id. Plaintiff kept trying to escape the officers holding him during the escort back to his cell. Id.

After staff use of force against an inmate, it is Department procedure for a nurse to examine the innate for injuries. On June 6, 2007, the examination of Plaintiff was done by Paula Price, R.N. Because Plaintiff had just spewed brown liquid on the members of the Program Review Committee, Defendant Johnston ordered extra officers to enter Plaintiff's cell to maintain control of him during the nurse's examination. Id. Defendant Johnston also ordered that one of the officers video tape the entire medical examination so that Plaintiff could not claim he had been mistreated during the examination in retaliation for the assault against the PRC members. See (Doc. 119, Ex. 3-A, Video of Gray's Medical Exam).

Prior to the exam, corrections officers explained to Plaintiff that he would have to put a spit hood on and be handcuffed prior to the nurse's exam. Plaintiff followed orders, placing the spit hood over his head and allowing himself to be handcuffed and shackled by the officers. Once Plaintiff was hooded, cuffed, and shackled, corrections officers opened the cell door and ordered Plaintiff to step forward and sit on the bed. An officer explained to Plaintiff that the spit hood would be taken off once the officers determined there was nothing in his mouth. Plaintiff opened his mouth, and the spit hood was removed. Defendant Price then examined Plaintiff in his cell. Plaintiff was complaining that his face and head were swollen, his neck was scratched, and his wrist was cut. There were no visible injuries to Plaintiff's face, neck, and hands. Plaintiff also complained that his jaw and back hurt. Plaintiff had a good range of motion in his hands, fingers, and wrists; he was able to stand, sit, and walk without difficulty; and he was able to talk and move his jaw. Nurse Price told Plaintiff to sign up for a sick call if he had any

7

further problems. Plaintiff said that he understood Nurse Price. Defendant Price left the cell. The corrections officers backed Plaintiff up to the door, closed the door, and removed the shackles and handcuffs from Plaintiff. Plaintiff removed the spit hood and passed it out to the officers. Id.

After Plaintiff spewed brown feces smelling liquid on Mr. Walters, Mr. Kuhns, and Defendant Harlow, they showered and changed their clothes. Their clothing was collected as evidence. At 12:05 p.m., Mr. Walters, Mr. Kuhns, and Defendant Harlow were evaluated by the SCI-Huntingdon Medical Department. They were taken to J.C. Blair Hospital in Huntingdon, Pennsylvania, where they all received treatment for exposure to bodily fluids.

At 11:00 a.m. on June 6, 2007, Defendant Baird contacted the Pennsylvania State Police (PSP) and informed them of Plaintiff's assault on staff. At 12:40 p.m., PSP Trooper Sneath arrived at SCI-Huntingdon and conducted an investigation.

On June 7, 2007, Dr. Araneda, an SCI-Huntingdon physician, ordered an HIV antibody test, a hepatitis profile, and a hepatis C antibody test for Plaintiff due to his June 6, 2007, assault on staff. (Doc. 122, Ex. 10, Att A, Physician's Orders). Plaintiff signed a release allowing his hepatitis and HIV status to be released to staff; however, Plaintiff refused to consent to HIV testing. Id.

On June 8, 2007, at 9:10 a.m., Plaintiff asked for and was seen by a nurse. Plaintiff complained of a headache and pain in his right arm, hands, and body. Plaintiff asked the nurse for medications that he had taken for back issues in the past. The nurse noted that Plaintiff had a hoarse voice, but was able to get up from his bunk and move to the door. (Doc. 122, Ex. 10, Progress Notes). Later that day, Dr. Klemick ordered that Plaintiff be given Tylenol 325 mg

8

three times a day for 10 days and that blood pressure checks should be done on June 9, 2007 and June 13, 2007. Dr. Kemick also ordered that Plaintiff be given Elavil, an antidpressant. (Doc. 122, Ex. 10, Physician's Orders).

On June 9, 2007, Plaintiff refused to have his blood pressure taken by Nurse Kos. (Doc. 122, Ex. 10, Progress Notes).

On the morning of June 10, 2007, Plaintiff, who was housed in building D, section A2, cell number 1026, complained to corrections officers on the block the he was having chest pains. The SCI-Huntingdon Medical Department and Defendant Ewing, the RHU shift lieutenant, were notified. Defendant Fink arrived in the RHU to examine Plaintiff. (Doc. 119, Ex. 6-A, June 10, 2007 Video of Gray Medical Exam).

Defendant Mirabella ordered Plaintiff to put a spit hood on. Once Plaintiff placed the spit hood over his head, Defendant Mirabella unlocked the wicket door, but left the cell door closed. Defendant Ewing ordered Plaintiff to place both of his hands through the wicket. Defendant Mirabella applied handcuffs to Plaintiff in the front so that his hands were through the wicket in the cell door. Defendant Ewing applied a tether to the handcuffs and held the tether. Defendants Fink, Ewing, Mirabella, and Butler remained outside Plaintiff's cell. Defendant Fink began her examination. Defendant Fink needed to place a blood pressure cuff on Plaintiff's upper arm as part of her exam. Because of the handcuffs and the small size of the wicket opening, Plaintiff could not extend his hands far enough through the wicket for Defendant Fink to reach his upper arm. To allow Plaintiff to extend his arm further through the wicket, Defendant Ewing ordered Plaintiff's right hand uncuffed. The left handcuff was left on Plaintiff's wrist with the tether attached. Id.

9

Defendant Ewing ordered Plaintiff to kneel on the floor of his cell and place only his left arm through the wicket in the door. Defendant Ewing held the tether controlling Plaintiff's left arm. Defendant Mirabella stood outside Plaintiff's cell door, to the far left side of Plaintiff's cell, and Defendant Butler stood behind Ms. Fink and to the left of Defendant Ewing. Defendant Fink put the blood pressure cuff on Plaintiff's left arm and took his blood pressure. As Defendant Fink removed the blood pressure cuff, Plaintiff used his right arm to squirt an unknown liquid at Defendants Fink, Ewing, and Butler. The liquid hit Defendants Fink and Butler in the face and eyes, Defendant Butler on his left ear and wrist, and Defendant Ewing in his chest and arm. Defendant Ewing immediately pulled the tether tightly to the right side of the cell door in order to try and control Plaintiff and prevent him from making any additional attempts to spray other staff members. Defendant Butler also grabbed hold of the tether. Plaintiff was pulling against the tether when Defendant McMahon and correctional officers Yedlosky, Detwiler, and Hostler came to assist Defendants Ewing, Butler, and Mirabella. Defendant Mirabella took Defendant Butler's place holding the tether. Plaintiff removed his spit hood. Defendant Ewing ordered him to put the spit hood back on and keep it on. Plaintiff placed the spit hoot back over his head. Defendant Ewing released his hold on the tether and ordered Plaintiff to put both hands through the wicket in the door. Defendant Mirabella then handcuffed Plaintiff. C.O. Hostler then held an Electronic Immobilizing Device ("EBID").[3]

---

[3]An EBID hand-held device is a device that when pressed against a portion of the body, such as a hand, and is triggered by the person holding the EBID hand-held device, it delivers a non-lethal electronic shock into that particular body part. The purpose for using the EBID hand-held device is to gain control over an inmate when he is physically resisting orders or being combative with staff. It is a device used to ensure compliance with orders without injury to the inmate.

Defendant Butler let go of the tether, unlocked the slot in the bottom of the door of Plaintiff's cell, applied leg shackles to Plaintiff, and closed the slot. Plaintiff stated that he had a weapon on the floor by his cell door. An officer retrieved the weapon through the slot at the bottom of the cell door. As the corrections officers prepared to open Plaintiff's cell door, Plaintiff was told that if he resisted he would be taken to the floor. The corrections officers tried to open Plaintiff's cell door, but Plaintiff had used a T-shirt to tie the door shut from inside his cell. Defendant Mirabella gave the tether to one of the other officers and stepped back from Plaintiff's cell. C.O. Detwiler used a "J" tool to pull Plaintiff's cell door partly open, and Defendant Butler used a cutting tool to cut the T-shirt that Plaintiff had used to tie the door shut. When the T-shirt had been cut away, one of the officers started to open the cell door. Plaintiff tried to pull away from the officer holding the tether. At that time, C.O. Hostler applied the EBID hand-held device one time for about two seconds. Plaintiff began to struggle with the officers. The officers pulled Plaintiff out of his cell and placed him face down on the floor of the area near his cell. Defendant Ewing ordered that Plaintiff be strip searched and that all his clothing be cut off him. The corrections officers cut Plaintiff's clothes off him and performed a strip search. Id.

After Plaintiff was strip searched, Defendant Mirabella escorted the corrections officers controlling Plaintiff to Observation Cell #2. Defendant Mirabella unlocked the door to

Another nurse from the SCI-Medical Department, Sheri Rowles, RN, had arrived to replace Defendant Fink who had been in direct contact with the unknown liquid Plaintiff had squirted through the wicket. Plaintiff complained of head, back, and wrist pain. Ms. Rowles took photographs of the areas Plaintiff claimed were injured. Id.

After Plaintiff was strip searched, Defendant Mirabella escorted the corrections officers controlling Plaintiff to Observation Cell #2. Defendant Mirabella unlocked the door to

11

Observation Cell #2. The corrections officers walked Plaintiff into the cell, placed him on the floor, and removed his leg shackles. The corrections officers pulled Plaintiff to his feet and placed him on the bunk attached to the wall of the cell. The corrections officers uncuffed Plaintiff and, utilizing a different set of handcuffs, attached one end of the handcuffs to Plaintiff's left arm and attached the other end of the handcuffs to a bracket on the wall directly above his bunk. The officers then left Plaintiff in Observation Cell # 2, while Plaintiff's cell was searched. Plaintiff was found to have made a shank from plastic matching his asthma inhaler and to possess containers of urine and feces. Id.

Defendants Ewing, Fink, and Butler reported to the SCI-Huntingdon medical department to be examined for exposure to bodily fluids. They were subsequently taken to J.C. Blair Hospital in Huntingdon, Pennsylvania, where they all received treatment for exposure to bodily fluids, and Defendant Ewing's left wrist was x-rayed for an injury received during the incident. See (Doc. 122, Ex. 2, Att. B, Extraordinary Occurrence Report).

On June 10, 2007, Dr. Klemick ordered that Plaintiff's Tylenol be discontinued, the blood pressure checks discontinued, the Qvar asthma inhaler be discontinued, and that his Albuterol asthma inhaler be administered by staff. Dr. Klemick also ordered that Plaintiff be given twelve more doses of Elavil 75 mg daily. (Doc. 122, Ex. 10, Physician's Orders). Additionally, because Plaintiff squirted an unknown liquid on corrections officers, Defendant Harlow ordered Plaintiff placed on a water restriction, to prevent him from throwing liquid on staff members.[4] Plaintiff remained on water restriction until July 27, 2007.

_____

[4]When an inmate is placed on water restriction, the water supply to his cell is turned off.
(continued...)

At 11:20 a.m., on June 10, 2007, the PSP were notified of Plaintiff's assault on staff. (Doc. 122, Ex. 2, Att. B, Extraordinary Occurrence Report).

A cell extraction team was then organized to remove Plaintiff from Observation Cell #2 and escort him back to his regular cell in the RHU. (Doc. 119, Ex. 8-A, Video of June 10, 2007, Cell Extraction). While in Observation Cell #2, Plaintiff threatened to assault staff members. He remained handcuffed by his left arm to the wall of Observation Cell #2. The cell extraction team arrived at Observation Cell #2 and explained to Plaintiff the procedures for the cell extraction. Plaintiff placed a spit shield on and was shackled and handcuffed. At approximately 1:08 p.m., Plaintiff's left arm was uncuffed from the wall. Members of the cell extraction team gave Plaintiff a sheet to cover himself before leaving Observation Cell # 2. Plaintiff was then escorted to his regular cell, cell DA2-1026. Id.

On June 11, 2007, Plaintiff was housed at SCI-Huntingdon, in building D, section B, cell number 1001. At some point during the 2:00 p.m. to 10:00 p.m. shift on June 11, 2007, Plaintiff tied his jumpsuit into a noose and threatened to hang himself. He also smeared the walls of his cell with his own feces. To prevent Plaintiff from hanging himself, several SCI-Huntingdon staff members directed Plaintiff to give them his jumpsuit in exchange for a suicide smock.[5] Plaintiff refused to comply with this order. Although, sometime later, Plaintiff put

---

[4](...continued)
Every thirty minutes a corrections officer goes to the inmate's cell and asks if he needs water. If the inmate requests water, the water is turned back on for the inmate's use. The water is turned off after the inmate is finished using it.

[5]A suicide smock is a non-restrictive quilted garment that cannot be rolled into a cord or torn into strips.

back on his jumpsuit, continued to threaten to harm himself, and began tearing pieces of cloth off his jumpsuit. (Doc. 119, Ex. 11-A, June 11, 2007 Video of Cell Extraction).

At 5:23 p.m., Defendant Hoffmaster received a medical call regarding Plaintiff wanting to harm himself. (Doc. 122, Ex. 10, Att A, Progress Notes). At 5:25 p.m., Defendant Hoffmaster went to Plaintiff's cell. Plaintiff had an orange jumpsuit on and had torn strips of material off of it. Plaintiff requested to see a psychiatrist. Plaintiff stated that he was not eating or taking his medications because he was "afraid." Plaintiff would not elaborate on why he was afraid. Id.

At 5:50 p.m., Defendant Hoffmaster paged Dr. Polmueller, Dr. Polmueller suggested that security handle Plaintiff's behavior and that Plaintiff be placed on the list to see a psychiatrist on June 12, 2007. Id. At 6:00 p.m., Defendant Hoffmaster notified Defendant Holtz, the shift lieutenant on duty, of Dr. Polmueller's suggestions. Id.

Later in the day, still concerned that Plaintiff might try to hang himself with the jumpsuit, staff members made a decision to transfer Plaintiff to a temporary observation cell and remove his jumpsuit. At that time, Plaintiff had smeared feces on his cell walls, and it was believed on his person. The reason for removing Plaintiff from his cell was to allow the feces to be cleaned from Plaintiff's cell wall, to shower Plaintiff, and to allow officers to take Plaintiff's jumpsuit from him so that he could not harm himself with it. Id.

Defendant Holtz assembled a cell extraction team to take Plaintiff from his cell. The cell extraction team consisted of five corrections officers. C.O. Plummer carried an EBID

shield[6] and C.O. Hershey carried the EBID hand-held device. In accordance with Department policy, Defendant Deanna Strittmatter was also present to examine Plaintiff if it were necessary to use force against him. Prior to assembling the cell extraction team, medical was consulted. Medical cleared the use of the EBID devices on Plaintiff, but not oleoresin capsicum due to Plaintiff's asthma. (Doc. 119, Ex. 11-A, June 11, 2007 Video of Cell Extraction).

At 9:25 p.m., Plaintiff was removed from the cell so that it could be cleaned and his jumpsuit could be removed. Defendant Holtz led the cell extraction team. Prior to moving Plaintiff, Defendant Holtz explained to Plaintiff that if he became combative, the EBID devices would be used. Defendant Holtz then ordered Plaintiff to come to the door to be cuffed. Plaintiff refused to comply with the order. Officers opened Plaintiff's cell door and attempted to enter. Plaintiff grabbed the mattress from his bunk and used it as a shield against the cell extraction team. C.O. Plummer with the EBID shield was the first officer to enter the cell. C.O. Plummer used the EBID shield to pin Plaintiff against the wall of the cell. The cell extraction team then picked up Plaintiff and placed him on his bunk, with the EBID shield on top of Plaintiff. C.O. Plummer activated the EBID shield when Plaintiff continued to struggle against officers. While Plaintiff was on the bunk, the cell extraction team members cuffed his hands behind his back, connected a tether to the handcuffs, and applied leg shackles. The cell extraction team members took Plaintiff to an empty cell so that the feces could be cleaned from

---

[6]An EBID shield is a riot shield approximately 24 inches wide and 48 inches in height that can be used as a protective shield or activated to send a non-lethal electric shock into the body of the person the shield is pressed against. The EBID shield is triggered by the person holding the shield. The purpose for using the EBID shield is to gain control over an inmate when he is physically resisting orders or being combative with staff. It is a device used to ensure compliance with orders without injury to the inmate.

his cell. In the temporary cell, the cell extraction team members placed Plaintiff on the bunk. Because an EBID had been activated against Plaintiff, Defendant Holtz requested that Defendant Deanna Strittmatter examine Plaintiff for any injuries. Defendant Strittmatter examined Plaintiff and found no injuries. It was also found that Plaintiff had not smeared feces on his person, so a shower was not needed. Id. See also (Doc. 122, Ex. 10, Att. A, Progress Notes).

After the nurse's examination, Plaintiff struggled with members of the cell extraction team twice. After the first time, Plaintiff was again told if he became combative, the EBID devices would be used. After Plaintiff's second struggle with members of the cell extraction team, as ordered by Defendant Holtz, the cell extraction team lifted Plaintiff off the bunk and placed him on his feet. Plaintiff was walked backwards to the door and his hands, which were cuffed behind his back, were placed through the wicket in the door. All cell extraction team members left the cell. Outside the cell, one officer held Plaintiff's hands by the tether and another officer held the EBID hand-held device on Plaintiff's hand. Defendant Holtz told Plaintiff that if he became combative against the officers, the EBID hand-held device would be activated. While Plaintiff's cell was being cleaned, his hands remained in the wicket door, held by one of the officers. Plaintiff tried several times to pull his hands and the tether into the cell to escape the control of the officer holding the tether; therefore, C.O. Hershey activated the EBID hand-held device on Plaintiff's hand. Id.

Once Plaintiff's cell was cleaned, the cell extraction team moved Plaintiff from the temporary cell back to his cell. The cell extraction team placed Plaintiff on the bunk, and Defendant Holtz told Plaintiff that his jumpsuit would be cut off and that he would be strip searched. Defendant Holtz also told him that he was to obey all orders given and that, if he

became combative with the officers, the EBID shield or EBID hand-held would be activated against him. Id.

As the members of the cell extraction team cut off Plaintiff's jumpsuit with medical scissors, he began to pull away from the officers and refused to comply with orders to stop resisting the officers. Because of this resistance, the EBID hand-held device and shield were activated against Plaintiff several times while Plaintiff's jumpsuit was being cut off. Part way through cutting off Plaintiff's jumpsuit, at approximately 9:00 p.m., Defendant Holtz noticed that Plaintiff appeared to be having breathing problems. Knowing that Plaintiff has asthma, Defendant Holtz called Defendant Deanna Strittmatter into the cell to examine Plaintiff. Defendant Holtz also sent an order to the SCI-Huntingdon Medical Department for Plaintiff's asthma inhaler to be brought to the RHU. Id. See also (Doc. 122, Ex. 10, Progress Notes).

Defendant Strittmatter administered two doses of the asthma inhaler to Plaintiff. She took his pulse, found it to be regular, listened to his lungs through a stethoscope, and found his lungs to be clear. Defendant Strittmatter told Plaintiff that he was all right and she left the cell. Id.

Once the cell extraction team had completed cutting off and removing Plaintiff's jumpsuit, Defendant Holtz ordered the team to do a complete strip search of Plaintiff. Defendant Holtz again told Plaintiff that if he did not follow the officer's orders or if he became combative with the officers or tried to bite or spit at any of them, then the EBID shield or EBID hand-held device would be used against him. Id.

After the strip search was completed, all members of the cell extraction team, except the officer holding the tether to Plaintiff's handcuffs, left the cell. The officer holding the tether

to Plaintiff's handcuffs then walked Plaintiff backwards to the cell door and pulled Plaintiff's hands through the wicket in the door. The cell door was closed and the officer removed Plaintiff's handcuffs. Plaintiff was given a suicide smock. As soon as the cell door was closed, Plaintiff began screaming profanities and threats to murder officers. Defendant Deanna Strittmatter tried to examine Plaintiff for any injuries, but he refused medical treatment, claiming he was a warrior and had no injuries. Id.

As a result of the incident, Plaintiff's mattress was taken away. It was returned to him on June 15, 2007. Plaintiff's orange jumpsuit was returned to him on June 19, 2007. Additionally, Plaintiff's meals were delivered to him by opening the wicket in his door. There were occasions when meals were being delivered, and Plaintiff refused to obey orders to put on a spit shield or show he had nothing in his hands. (Doc. 122, Ex. 5, Declaration of Diane Settle, Acting Records Supervisor at ¶ 7). When Plaintiff refused to obey these orders, he was not given a meal. Id. There were also occasions when Plaintiff refused meals of his own volition. Id. Between July 6, 2007 and July 27, 2007, Plaintiff refused fourteen meals either of his own volition or by not obeying orders. Id.

On May 22, 2009, Plaintiff filed the instant action. (Doc. 1, complaint). Proceeding via an amended complaint, Plaintiff seeks compensatory and punitive damages for Defendants' alleged excessive use of force by prison staff, inhumane conditions of confinement, denial of medical care, failure to intervene, conspiracy pursuant to §§ 1983, 195 and 1986, deprivation of equal rights pursuant to § 1981 and state law tort violations. Id. (Doc. 8, Amended Complaint).

On September 16, 2010, Plaintiff pled guilty in the Huntingdon County Court of Common Pleas to one count of Aggravated Harassment by Prisoner for intentionally or

18

knowingly causing or attempting to cause Michael Harlow to come into contact with saliva and fecal matter, by spitting or expelling such fluid or material on June 6, 2007, and one count of Aggravated Harassment by Prisoner for intentionally and knowingly causing or attempting to cause Sheila Fink to come into contact with urine by throwing, tossing or expelling such fluid or material on June 10, 2007. (Doc. 122, Ex. 12, 13, Criminal Information and Plea Agreements).

## III.     Discussion

### A. Eighth Amendment Claim - Use of Force

To establish an Eighth Amendment violation, Plaintiff must demonstrate both a subjective and an objective component. Hudson v. McMillian, 503 U.S. 1, 8, (1992). In considering the subjective component of an excessive force claim under the Eighth Amendment, the central question is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Id. at 7; Fuentes v. Wagner, 106 F.3d at 348-49; see also Concepcion v. Morton, 125 F. Supp. 2d 111, 125 (D. N.J. 2000) (holding that hindsight will not be used to second guess actions of correctional officers who perceived a dangerous situation, as prison personnel are afforded great deference when dealing with precarious situations). Courts look to several factors in making this determination, including: (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of the injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of the response. Id at 8, quoting Whitley v. Albers, 475 U.S. 312, 321 (1986). The objective prong is satisfied if the alleged

wrongdoing was objectively "harmful enough" to establish a constitutional violation. Hudson, 503 U.S. at 8.

In the present case, it is clear that there exists no genuine issues of material fact with respect to the events which occurred during the five day span between June 6, through June 11, 2007. Gray began a course of violent and disruptive behavior. Beginning on June 6, 2007, when he spewed fecal matter on Defendant Harlow, continuing on June 10, 2007, when he threw urine at Defendant Fink, and culminating in threats to staff, smearing feces on his cell walls, and threatening to harm to himself on June 11, 2007, Plaintiff's actions posed a serious threat to the safety of staff and inmates, which resulted in Defendants' use of force again him that was reasonable under the circumstances, and applied in a good-faith effort to maintain or restore discipline. Additionally during this period, Plaintiff was found to possess weapons and containers of urine and feces in his cell.

Gray alleges that on June 6, 2007, while in the PRC room, Defendants "started punching Plaintiff about the face and upper body area...tackled Plaintiff off of the chair he was sitting in to the ground and then began to stomp, kick, punch and beat Plaintiff about the face, head, shoulders, arms, stomach, legs, trunk areas, and ankles" and that "once out of the PRC room, Defendants, did throw Plaintiff down the steps leading to the first level of G-B Block", then "rushing Plaintiff through the rotunda between G-B and G-C blocks, all the while they were punching Plaintiff about his body, including his penis and buttocks." (Doc. 8, ¶¶ 32-37). He further claims that on June 10, 2007, Defendant Ewing "did pull Plaintiff out of his cell by the tether attached to the handcuffs" and "did repeatedly shock Plaintiff with the EBID hand held stun gun" while "Defendant Ewing did repeatedly call Plaintiff 'nigger' and 'faggot with AIDS'

over and over again." Id. at ¶ 50. He also contends that on June 11, 2007, Defendants placed in him "D observation by himself to totally isolate him from all other inmates...so no other inmates could witness the continuous torture and abuse of Plaintiff over a prolonged period of time", refusing Plaintiff "water, bedding and other basic necessities." Id. at ¶ 55.

The Court, having viewed the videotapes of June 10, 2007, and June 11, 2007, and the Extraordinary Occurrences documentation, finds Gray's claims regarding these dates completely unsubstantiated.

The videotape of June 10, 2007, reveals that Plaintiff was extracted from his cell after he squirted an unknown liquid on Defendant Nurse Fink. Consistent with Plaintiff's allegations, an EBID hand-held device was applied to Plaintiff's hand by C.O. Holster for about two seconds when Plaintiff struggled against the officers as they were attempting to cut open the cell door that he had tied shut. However, prior to the use of the EBID hand-held device, Plaintiff was told not to resist, and that the device would be used if he did not follow orders. Thus, in light of the necessity to maintain order, and a lack of malicious intent on behalf of the officers, the application of the EBID, under these circumstances, did not constitute excessive use of force. See Baez v. Lancaster Co., 487 F. App'x 30, 32 (3d Cir. 2002) (concluding that the application of an EBID for ten seconds does not constitute excessive use of force against inmate when used to maintain order and there is no evidence of malice).

Once removed from his cell, Plaintiff was taken to an observation cell, strip searched, and restrained in the cell, where he remained for approximately two hours and twenty four minutes, while Plaintiff's cell was cleaned of the urine and feces that were present. Plaintiff was then removed from the observation cell and returned to his original cell. As is evident from the

videotape, an application of the Whitley factors, under these circumstances, shows that on June 10, 2007, Defendants used only force which was reasonable and necessary to restore order. Finally, the Court finds that placing an inmate in restraints to clean his cell after the inmate smeared feces on the walls does not violate the Eight Amendment. See Banks v. Mozino, 423 F. App'x 123 (3d Cir. 2011) (per curiam) (determining that an inmate held in a restraint chair for nine hours while fecal matter was cleaned from his cell did not constitute excessive force).

The June 11, 2007, video reveals that Plaintiff was removed from his cell after threatening harm to himself and smearing fecal matter on his cell walls. Once again, consistent with Plaintiff's allegations, an EBID hand-held device and EBID shield were applied to Plaintiff. However, they were used only in response to Plaintiff's non-compliance, and only after Plaintiff was repeatedly warned that the EBID would be used against him if he failed to comply with the cell extraction team. Nowhere in the video is it seen that Plaintiff was continuously shocked or shocked without reason. Nor was Plaintiff punched, slammed, or sexually assaulted. Contrary to Plaintiff's assertion that Defendants threatened Plaintiff, the video reveals that Plaintiff, himself, threatened Defendant Holtz and the cell extraction team with murder. As is evident from the video, the force used to control Plaintiff on June 11, 2007, was not excessive.

With respect to the June 6, 2007, incident in the PRC hearing, the record evidence demonstrates that Plaintiff lunged and spewed feces on Defendant Harlow and the other PRC committee members. In response to this act, Defendants Strittmatter and Williamson used force to obtain control over Plaintiff. Defendant Strittmatter pulled on the tether attached to Plaintiff's handcuffs to move Plaintiff away from the PRC members, while Williams struck

Plaintiff in the neck and shoulder area with his forearm to bring him onto the floor. Defendant Houp and Sgt. Hoover then joined Strittmatter and Williamson in restraining Plaintiff while he was escorted back to his cell. The Court finds the Defendants' use of force in subduing Plaintiff was applied in a good-faith effort to regain control within the PRC hearing room.

However, the remaining facts posited by Defendants, as to the manner in which Plaintiff was escorted from the PRC hearing room back to his cell, have been adequately controverted by Plaintiff. While Defendants submit declarations stating that at no time did Sgt. Hoover, Defendants Strittmatter, Williamson, and Houp, or any other officer, throw Plaintiff down the stairs from the hearing room to the first level of the RHU, or punch Plaintiff about his body, buttocks, or penis, Plaintiff submits his own declaration, as well as the declaration of three inmates who claim to have witnessed Defendants escorting Plaintiff down the steps of the RHU unit to his cell in G-Block. See (Docs. 140, 141).

While Defendants have refuted the validity of two of the inmates' declarations, demonstrating that Inmate Velez was not housed on G Block on the date in question, see (Doc. 145, Declaration of Constance Green, Corrections Superintendent's Assistant at ¶ 4), and that Inmate Sutton's cell (G-D 2011), which was on the second floor of G Block, on the date in question, has a wall in front of it, completely blocking his view of the first floor cells and staircases in the G Block, see (Doc. 145, Ex. 2, Att. 1, video of view from cell G-D 2011), there remains the uncontested declaration of Inmate Berry.

Inmate Berry's declaration states, in pertinent part, that "as the inmate was being pulled down the last few steps, [he] could see the inmate's face under the spithood that was on his head, and [he saw] inmate Anthony Gray being pulled roughly to his feet by C.O.'s

23

Williamson, Strittmatter, Houp and Sergeant Hoover" and "as they pulled inmate Gray to his feet, they began to attack inmate Gray by throwing punches to his head and upper body." See (Doc. 141, Declaration of Mario Berry). Berry's declaration creates factual disputes that are necessary to determine if Gray's Eighth Amendment rights were violated. Although documentary evidence normally verifies some of the contested facts, the only evidence submitted by the parties as to the transport of Plaintiff back to his cell from the PRC Hearing is the parties' competing declarations. A review of these documents reveals that the remaining disputed facts create material issues of fact that can only be resolved by a trier of fact, as they may reasonably be resolved in favor of either party. See Anderson, 477 U.S. 242 at 251. As such, Defendants' motion for summary judgment will be denied as to the Plaintiff's Eighth Amendment excessive force claim regarding his transport from the PRC Hearing.

Finally, borne out of Plaintiff's excessive force claim is Plaintiff's claim that Defendants Johnston and Mirabella failed to intervene in Defendants' alleged excessive use of force. Plaintiff claims that Defendants Johnston and Mirabella "stood by and watched Plaintiff get beat and then thrown and drug down the steps of G-B pod, an then beaten until Plaintiff was off of G-B pod." (Doc. 139, brief in opposition at 6).

To maintain a claim for "failure to intervene", a plaintiff must establish the officer's (1) presence at the scene, (2) knowledge that a constitutional violation was occurring, and (3) the existence of a realistic opportunity to intervene. See Smith v. Mensinger, 293 F.3d 641, 650-51 (3d. 2002). In Mensinger, the United States Court of Appeals for the Third Circuit dealt with a situation in which the plaintiff had his back to the defendant prison officers while he was being beaten. The Court of Appeals held that, although plaintiff could not determine the specific

24

participation of each officer, the fact that the named officer-defendants were in the vicinity when plaintiff alleged to have been beaten was sufficient to defeat summary judgment on plaintiff's Eighth Amendment claim for excessive use of force.

In response to Plaintiff's claim, Defendant Marabella submits his own declaration, stating that he "was not present in the Restricted Housing Unit Hearing Room when the Program Review Committee was holding hearings on June 6, 2007," and that he "did not witness Mr. Gray spew a brown liquid on the Program Review Committee members, and was not present when corrections officers removed Mr. Gray from the hearing room and took him back to this cell." (Doc. 122, Ex. 6, Declaration of Sergeant Scott Mirabella at 1-2). Defendant Johnston states that he "was present in the Restricted Housing Unit hearing room at 9:50 am when Corrections Officers Daryl Strittmatter and Robert Williamson forced Anthony Gray down to the floor of the hearing room after Mr. Gray spewed brown feces-smelling liquid onto the members of the Program Review Committee" and that he did witness Defendants "maintain control of Mr. Gray as he continued to struggle against the officers when they returned Mr. Gray to his cell in the Restricted Housing Unit." (Doc. 122, Ex. 3, Johnston declaration at 2-3). Plaintiff, however, submits his own declaration, stating that both Johnston and Marabella were present, and both "stood by and watched as [plaintiff] was attacked by the named Defendants." (Doc. 10, Gray declaration at 2). As such, these documents reveal a disputed material issue of fact that can only be resolved by a trier of fact. See Anderson, 477 U.S. 242 at 251. Accordingly, the Court will deny Defendants' motion for summary judgment, as it pertains to Plaintiff's failure to intervene claim.

### B. The Eighth Amendment Standard - Deliberate Indifference

25

In order to establish an Eighth Amendment medical claim, a plaintiff must show "(i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." Natale v. Camden Cty. Correctional Facility, 318 F.3d 575, 582 (3d Cir. 2003). See also Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999). A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that a layperson would recognize the need for a doctor's attention. Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987). In addition, "if unnecessary and wanton infliction of pain results as a consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the eighth amendment." Id. (quotation and citation omitted).

A prison official acts with deliberate indifference to an inmate's serious medical needs when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). Thus, a complaint that a physician or a medical department "has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment...." Estelle v. Gamble, 429 U.S. 97, 106 (1976). For instance, a "medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice." Id., 429 U.S. at 107. "[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights." Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990). Further, a doctor's disagreement with the professional judgment of another doctor is not actionable under the

Eighth Amendment. See White v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990). In sum, negligence, unsuccessful medical treatment, or medical malpractice does not give rise to a § 1983 cause of action, and an inmate's disagreement with medical treatment is insufficient to establish deliberate indifference. See Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993).

Further, a prison administrator cannot be found deliberately indifferent under the Eighth Amendment because he or she fails to respond to the medical complaints of an inmate being treated by a prison physician, or because, as non-physicians, they defer to the medical judgment of the inmate's treating physicians. Durmer, 991 F.2d at 69. If, however, non-medical prison personnel had "a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner," liability may be imposed. Spruill, 372 F.3d 236.

A mere difference of opinion between the prison's medical staff and the inmate regarding the diagnosis or treatment which the inmate receives does not support a claim of cruel and unusual punishment. Farmer v. Carlson, 685 F. Supp. 1335, 1339 (M.D. Pa. 1988). See McCracken v. Jones, 562 F.2d 22, 24 (10th Cir. 1977); Smart v. Villar, 547 F.2d 112, 113 (10th Cir. 1976), cert. denied, 450 U.S. 1041 (1981).

Additionally, if there is a dispute over the adequacy of the received treatment, courts have consistently been reluctant to second guess the medical judgment of the attending physician. Little v. Lycoming County, 912 F. Supp. 809, 815 (M.D. Pa.), aff'd, 101 F.3d 691 (3d Cir. 1996). The key question is whether the defendant has provided the plaintiff with some type of treatment, regardless of whether it is what the plaintiff desires. Farmer, 685 F. Supp. at 1339.

The extensive documentation of record, as well as the video recordings of Plaintiff's medical encounters on June 6 through June 11, 2007, indicate that contrary to Plaintiff's allegations, Plaintiff did receive medical treatment following the incidents of June 6, 10, and 11, 2007.

The record evidence reveals that on June 6, 2007, Defendant Price examined Plaintiff following his assault on staff and found no injuries. On June 8, 2007, Plaintiff complained of body aches and was seen by a nurse and prescribed Tylenol. Following Plaintiff's June 10, 2007 assault on Nurse Fink, Plaintiff was examined instead by Nurse Rowles. On June 11, 2007, video evidence demonstrates that Plaintiff was seen by two nurses, Defendant Hoffmaster, prior to the incident, and Defendant Strittmatter, during the cell extraction. Nurse Strittmatter did not examine Plaintiff following the June 11, 2007, incident because he stated he had no injuries and was screaming profanities and threatening staff. Additionally, Plaintiff's medical record demonstrates that Plaintiff was seen by eight medical professionals from June 12, 2007, through June 27, 2007, and was at no time refused medical treatment.

As to Defendants' treatment of Plaintiff's asthma, Plaintiff himself states that during the strip search he "started to have an asthma attack and Defendant Holtz did send Defendant LPN Strittmatter into the cell to give Plaintiff two puffs of his asthma inhaler" and "took Plaintiff's pulse." (Doc. 8, Amended Complaint). The video recording also demonstrates that Nurse Strittmatter listened to Plaintiff's lungs before the cell extraction team continued the strip search. Thus, the record demonstrates that Defendants Fink, Strittmatter, and Hoffmaster did not deny Plaintiff his asthma inhaler.

28

To the extent that Plaintiff disagrees with medical personnel concerning what treatment he should have received, such disagreement does not serve as a predicate to liability under § 1983. See White v. Napoleon, 897 F.2d at 108-110 (3d Cir. 1990) (No deliberate indifference claim is stated when a doctor disagrees with the professional judgment of another doctor since "[t]here may, for example, be several acceptable ways to treat an illness."); Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979) (holding that a claim for deliberate indifference does not arise just because one doctor disagrees with the diagnosis of another). This is particularly so in light of the fact that there is no evidence of record that any of the Defendants intentionally withheld medical treatment from Plaintiff in order to inflict pain or harm upon him. See Rouse, 182 F.3d 192. Plaintiff's complaints amount to nothing more than his subjective disagreement with the treatment decisions and medical judgment of the medical staff at the prison.

While Plaintiff may not be in agreement with the medical decisions made, he was accorded continual medical care. Consequently, Plaintiff has failed to present evidence from which a reasonable jury could conclude that Defendants possessed the culpable mental state necessary for Eighth Amendment liability to attach. See Estelle, 429 U.S. at 106; Monmouth County Correctional Institution Inmates, 834 F.2d at 346; West v. Keve, 571 F.2d at 161. Indeed, the extent and quality of medical attention that Defendants provided Plaintiff precludes a finding of deliberate indifference.

## C. Eighth Amendment Claim - Conditions of Confinement

"When an Eighth Amendment claim arises in the context of a challenge to conditions of confinement, a court must determine if prison officials acted with 'deliberate indifference' to

the inmate's health. Farmer v. Brennan, 511 U.S. 825, 837 (1994)." Fuentes v. Wagner, 206 F.3d 335, 345 (3d Cir. 2000). In this setting, "The Eighth Amendment prohibits punishments inconsistent with "evolving standards of decency that mark the progress of a maturing society." Estelle, 429 U.S. at 102 (quoting Trop v. Dulles, 356 U.S. 86 (1958)). Conditions of prison confinement violate the Eighth Amendment only if they "deprive inmates of the minimal civilized measure of life's necessities." Rhodes v. Chapman, 452 U.S. 337, 347 (1981). See Atkinson v. Taylor, 316 F.3d 257, 272 (3d Cir. 2003).

When courts have in the past considered specific conditions of confinement alleged by inmates under this Eighth Amendment standard, it is apparent that many of the complaints advanced by Gray have been found not to "deprive inmates of the minimal civilized measure of life's necessities." Rhodes v. Chapman, 452 U.S. 337, 347 (1981). For example, "[p]ursuant to the case law related to the denial of bedding, the denial of [an inmate's] mattress for a short period of time does not rise to the level of a constitutional violation." Milhouse v. Gee, 2011 WL 3627414, *13 (M.D. Pa. 2011) (holding that two week denial of mattress was not sufficiently serious to rise to the level of an Eighth Amendment violation); Schaeffer v. Schamp, 2008 WL 2553474, *6 (W.D. Pa. 2008) (finding that confinement in hard cell for ten days without a mattress does not constitute cruel and unusual punishment); Castro v. Chesney, 1998 WL 767467 (E.D. Pa. 1998) ("Plaintiff's allegation that he was deprived of a mattress and blanket for a period of two days, even if proved, would not rise to the level of a constitutional violation."); Stephens v. Cottey, 145 F. App'x 179, 181 (7th Cir. 2005) (holding no Eighth Amendment violation exists where prisoner spent three days without a mattress sleeping on a metal bedframe and five days with no bedframe sleeping on the floor).

In cases involving inmates throwing feces at prison staff or smearing feces on cell walls, the Third Circuit has granted summary judgement where the inmate failed to establish that conditions, including the denials of running water, a mattress, clothes, and a blanket, and being placed in restraints, posed a substantial risk of serious harm. See Banks v. Mozino, 423 F. App'x 123 (3d Cir. 2011) (per curiam); Guinn v. Rispoli, 323 F. App'x 105 (3d Cir. 2009) (per curiam); see also Williams v. Delo, 49 F.3d 442, 446 (8th Cir. 1995) (finding no Eighth Amendment violation where prisoner was placed in a strip cell without clothes, the water in the cell was turned off and mattress removed, and prisoner's bedding, clothing, legal mail, and hygiene supplies were withheld). Additionally, the Court has found that denial of meals for failure to follow a direct order does not violate the Eighth Amendment. Gillespie v. Beard, 2011 WL 2160479 (M.D. Pa. 2011).

Accordingly, to the extent that Gray lodges specific condition of confinement claims against Defendants, those claims all relate to matters which do not rise to the level of a deprivation of "the minimal civilized measure of life's necessities." Rhodes, 452 U.S. at 347. Furthermore, Plaintiff has failed to show any deliberate indifference on the part of Defendants. Plaintiff was placed on greater than normal security precautions as a result of his own actions, which included threatening to hurt staff and himself. For these reasons, Defendants are to be granted summary judgment as a matter of law.

### D. Section 1983 Conspiracy Claims

To sustain a conspiracy claim under section 1983, Gray must establish that: (1) defendants deprived him of a right secured by the Constitution or laws of the United States, and (2) conspired to do so while acting under color of state law. Adickes v. S.H. Kress & Co., 398

U.S. 144, 150 (1970); Marchese v. Umstead, 110 F. Supp. 2d 361, 371 (E.D. Pa. 2000).

Additionally, "'to [s]ufficiently allege a conspiracy, a plaintiff must show a combination of two or more persons to do a criminal act, or to do a lawful act by unlawful means or for an unlawful purpose'." Marchese, 110 F. Supp. 2d at 371 (quoting Panayotides v. Rabenold, 35 F. Supp. 2d 411, 419 (E.D. Pa. 1999)). "'A plaintiff must make specific factual allegations of combination, agreement, or understanding among all or between any of the defendants to plot, plan, or conspire to carry out the alleged chain of events'." Id. (quoting Panayotides v. Rabenold, 35 F.Supp.2d 411, 419 (E.D. Pa. 1999)) (other internal citations omitted).

With regard to Gray's § 1983 conspiracy claim, there are simply no allegations in the complaint to support a plan or agreement of the Defendants to conspire or engage in a corrupt plot to violate Plaintiff's civil rights. The Court therefore rejects Gray's factual contentions as clearly baseless. See Young vs. Kann, 926 F.2d 1396, 1405 n.16 (3d Cir. 1991) (finding conspiracy claims which are based upon pro se plaintiff's subjective suspicions and unsupported speculation properly dismissed under § 1915(d)). The allegations in the complaint are vague and conclusory and do not present a cognizable § 1983 conspiracy claim. Accordingly, the Court will grant Defendants' motion for summary judgment as a matter of law.

### E. Section 1985(3) and 1986 Conspiracy

Section 1985(3) establishes a cause of action "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3). It is well settled that "because § 1985(3) requires the 'intent to deprive of equal protection, or equal privileges and immunities,' a claimant must allege 'some racial, or perhaps otherwise class-based, invidiously

32

discriminatory animus behind the conspirators' action' in order to state a claim." <u>Farber v. City of Paterson</u>, 440 F.3d 131, 135 (3d Cir. 2006) (quoting <u>Griffin v. Breckenridge</u>, 403 U.S. 88, 102 (1971)).

In this case, Plaintiff has failed to plead the requisites of a § 1985(3) conspiracy, as the pleadings of record are devoid of allegations that Defendants' conduct was motivated by a class-based, invidiously discriminatory animus. "[M]ere conclusory allegations of deprivations of constitutional rights are insufficient to state a § 1985(3) claim." <u>D.R. by L.R. v. Middle Bucks Area Vocational Technical School</u>, 972 F.2d 1364, 1376 (3d Cir. 1992), <u>cert. denied</u>, 506 U.S. 1079 (1993). Therefore, his mere allegations of conspiracy cannot stand as a matter of law. <u>See</u> <u>United States ex rel. Simmons v. Zibilich</u>, 542 F.2d 259 (5th Cir. 1976) (holding that the dismissal of a cause of action for damages arising out of alleged conspiracy to interfere with civil rights was proper where the convict's conclusory pleadings failed to allege any facts on which to base a conspiracy charge).

Plaintiff also alleges liability under 42 U.S.C. § 1986, but has failed to identify any specific acts or inactions by Defendants that support liability under 42 U.S.C. § 1986. Liability under 42 U.S.C. § 1986 is predicated on knowledge of a violation of 42 U.S.C. § 1985. <u>Bell v. City of Milwaukee</u>, 746 F.2d 1250, 1256 (7th Cir. 1984). As stated above, Plaintiff has not alleged any facts to support liability under 42 U.S.C. § 1985. Consequently, his claim under 42 U.S.C. § 1986 will be dismissed with prejudice. <u>Accord</u> <u>Rouse v. Benson</u>, 193 F.3d 936, 943 (8th Cir. 1999) (holding that the inmate's allegations did not support liability under 42 U.S.C. §§ 1985(3) or 1986 as he failed to demonstrate a meeting of the minds of the alleged conspirators).

**F. Section 1981**

Gray brings a claim pursuant to 42 U.S.C. § 1981. That statute states in relevant part:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no others.

42 U.S.C. § 1981(a).

To establish a claim under § 1981, a plaintiff must establish: (1) that he is a member of a racial minority; (2) intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in the statute. Brown v. Philip Morris, Inc., 250 F.3d 789, 797 (3d Cir. 2001).

Here, Plaintiff fails to allege facts to demonstrate that similarly situated individuals outside his class were treated differently than him. Moreover, Plaintiff's only allegations demonstrating that discrimination was on the basis of race, involve the use of racial slurs on June 10, 2007. However, these allegations were contradicted by the video of the incident. Accordingly, Defendants are entitled to summary judgment.

## G. Pendent Jurisdiction

As summary judgment has been granted on Plaintiff's federal conspiracy claims, pursuant to 28 U.S.C. § 1367(c)(3)[7], the Court declines to exercise supplemental jurisdiction over any state law conspiracy claims raised by Plaintiff. The Third Circuit Court of Appeals has

_____

[7]Title 28 U.S.C. § 1367(c)(3) provides that "[t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... (3) the district court has dismissed all claims over which it has original jurisdiction." See also 28 U.S.C. § 1367(d).

held that "'where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so.'" Hedges v. Musco, 204 F.3d 109, 123 (3d Cir. 2000). There is no affirmative justification for exercising supplemental jurisdiction in this case. Accordingly, Gray's state law claims of conspiracy and concert of action will be dismissed, without prejudice. Plaintiff's remaining state law claims of battery, assault, and indecent sexual assault may remain.

A separate Order will be issued.

Dated: October 2, 2013

**United States District Judge**